The UNIVERSITY OF the SOUTH et al.,
Complainants-Appellees,

v.

FRANKLIN COUNTY, Tennessee et al.,
Defendants-Appellants.

Court of Appeals of Tennessee,
Middle Section.

July 27, 1973.

Rehearing Denied Sept. 9, 1973.

Certiorari Denied by Supreme Court
March 4, 1974.

Joe R. Hickerson, Winchester, Robert L. Lancaster, Sewanee, and Kelly & Cameron, South Pittsburg, for complainants-appellees.

Lynch, Lynch & Lynch, Winchester, for defendants-appellants, Franklin County, Roy T. Crownover, County Judge, Jesse T. Farris, Tax Assessor and Cortner McNutt, County Trustee.

David M. Pack, Atty. Gen., and William C. Koch, Jr., Asst. Atty. Gen., for the Board of Equalization of State of Tenn.

OPINION

PURYEAR, Judge.

This is a declaratory judgment suit which was precipitated by Franklin Coun-

ty's 1969 assessment, for the purpose of taxation, certain property of the University of the South at Sewanee, and certain leasehold interests in other property at Sewanee owned by the University and which has been leased by it for terms of years to various persons and corporations.

The bill was filed by the University and also joining therein as complainants were Robert S. Lancaster, Charles E. Cheston, Henry T. Kirby-Smith, William J. Hamilton and W. Hoyte Baker, lessees of property owned by the University, individually, and as class representatives of other lessees similarly situated. We will hereinafter refer to the latter mentioned complainants as "the lessees."

Named as defendants were Franklin County, Tennessee, Roy T. Crownover, County Judge, Jesse T. Farris, County Tax Assessor, and Cortner McNutt, County Trustee, and we will hereinafter refer to these defendants collectively as "the county", unless we refer to one or the other of them by name or title.

The Equalization Board of the State of Tennessee obtained leave of the trial Court to intervene in the suit as a party defendant and we will hereinafter refer to this defendant as "The State Board."

The complainants aver in said bill that the County has illegally assessed for taxation certain of their property which is exempt from taxation. Other allegations are made in the bill but they are not germane to the issues raised on this appeal.

In addition to praying for a judgment or decree declaring said property as exempt from taxation, complainants pray for an injunction restraining the defendants from taking any steps to enforce collection of taxes on said property; that the assessments be declared null and void, and for general relief.

The County, the Tax Assessor, the County Trustee and the County Judge filed a joint answer denying that said property of complainants which had been assessed was exempt from taxation and denying that said property had been illegally assessed but averring that said property was subject to taxation by the County and was properly and legally assessed therefor.

The State Board filed a separate answer generally taking the same position as that taken by the County and the County Officials in their answer.

Several interlocutory orders were entered from time to time but since none of them are germane to the issues raised on this appeal, no further mention of them is necessary.

The case came on to be heard before the Chancellor on August 31st, September 1st, and September 2nd, 1970, as a result of which the Chancellor rendered and filed a memorandum opinion in which he held, inter alia, that the property which the University and its lessees claimed as tax exempt was not subject to taxation by the County and a decree was entered accordingly. We will hereinafter refer to some specific provisions of such decree.

From said decree the County of Franklin, the County Judge, County Tax Assessor, County Trustee and the State Board of Equalization have prayed and perfected an appeal to this Court and assigned error.

The complainant, University of the South, is a Tennessee corporation, by a charter granted by the General Assembly of the State of Tennessee in January, 1958, by virtue of Chapter 29, of the Acts of 1957–58.

The pertinent provisions of the Charter of incorporation are Sections 9 and 10 of said Chapter 29, Acts of 1857–58, which are as follows:

"SEC. 9. Be it further enacted, That said University shall be established and located at Sewanee, on the Cumberland Mountain, in or near Franklin County, or at any other point that the Board of Trustees may hereafter designate in the State of Tennessee; the site to be select-

ed by said Trustees, or by such person or persons as they may appoint, which site shall continue until changed by the Trustees according to the provisions of the Constitution.

SEC. 10. Be if further enacted, That said University may hold and possess as much land as may be necessary for the building, and to such an extent as may be sufficient to protect said Institution and the students thereof, from intrusion of evil-minded persons who may settle near said Institution. Said land, however, not to exceed ten thousand acres, *one thousand acres of which, including buildings and other effects and property of said Corporation, shall be exempt from taxation, so long as said land belongs to said University.*" (emphasis supplied)

Shortly after its charter of incorporation was granted, the University commenced to acquire tracts of land in the vicinity of Sewanee, in Franklin County, some of which tracts of land were acquired by purchase and others by gift.

In 1861 the Board of Regents of the University designated and defined approximately one thousand acres of the land it had acquired as a reserve for the purpose of tax exemption pursuant to Section 10, Chapter 29, of the Acts of 1857–58, describing said one thousand acres by metes and bounds, according to an old survey, as follows:

"University Reservation of 1,000 Acres (1861)

Commencing at a stake (at head of Gipson's path) at the junction of two branches of a creek in section 12, range 21 near the point where the 'corso' crosses bridge (from this stake a chestnut oak bears S 24 degrees E 4 feet, and an oak in edge of road bears N 61 degrees W 13 feet).

Thence west 2,428 feet to a stake which is 141½ feet southwest of corner of sections 11 and 12 ranges 26 and 27.

Thence S 45 degrees W. 3,818½ feet to a hickory tree 5 inches in diameter at intersection of sections 18 and 19 ranges 33 and 34. This hickory is 50 feet easterly from 'corso' and 100 feet easterly from branch.

Thence S 45 degrees E. at 5,500 feet to turnpike, at 6,788 feet ends at stake at intersection of sections 30 and 31 ranges 21 and 22. From this stake a dogwood 8 inches thick bears S 30 degrees E 17 feet; a dogwood stump bears N 78 degrees W 6 feet.

Thence N 45 degrees E at 1,550 feet crosses road leading from turnpike to depot; at 4,400 feet crosses road, at 6,600 feet crosses road to coal banks; at 7,161 feet ends line at stake in branch, said stake being 60 feet down stream from a large rock in the branch. From this stake a holly bears N 60 degrees W 9 feet and a chestnut oak bears S 49½ degrees W 11 feet. From this stake the intersection of Sections 17 and 18 ranges 8 and 9 bears N 45 degrees 204 feet.

Thence down the channel of said branch to its emergence from University lands.

Thence westerly following edge of University lands to the creek from whence the first line started, and up the channel of said creek to the beginning stake."

Since that time, most of the buildings of the University have been located within the boundaries of this original reserve of one thousand acres.

Also since approximately 1867, the University has, from time to time, divided certain portions of its property into lots, both within and without the boundaries of the original reserve, many of which lots have been leased by the University to various persons and corporations and upon which the lessees thereof have constructed residences, offices, stores and other buildings in which various types of business enterprises are now located.

From 1867 up to the date the instant litigation was commenced, the University has

used several different forms of lease contracts, all of which provide, however, that buildings and other improvements on said leased premises are to be constructed by the lessees thereof and all of which leases provide that in the event taxes are levied on said property the lessee shall be responsible for the payment thereof.

Many of the residences constructed upon these leased premises are quite expensive and others not so expensive, but all of these improvements are of some value to the lessees and it is these leasehold estates which constitute a part of the property which was assessed for taxation by the County in the year 1969.

The instant litigation is not the first which has arisen out of a dispute between the County, on the one hand, and the University and its lessees, upon the other. The first such litigation resulted from a dispute which erupted between the University and the County, when in 1887, the County undertook to assess certain lots or parcels of land owned by the University and the case which resulted from that assessment, University of South v. Skidmore (1888), 87 Tenn. (3 Pickle) 155, 9 S.W. 892, was finally determined by the Tennessee Supreme Court. In its opinion in that case the Supreme Court referred to the reserve of one thousand acres and the property therein which the County was seeking to assess for taxation in the following language:

"The one thousand acres have been laid off as designated by metes and bounds, and upon this the buildings of the university have been erected, together with professors' houses, etc. A part of this one thousand acres along the line of the railroad has been subdivided into town lots, streets laid off and graded; along these dwelling-houses and store-houses and a hotel have been erected, and rented to persons upon leases extending from one year to thirty-three years, and with renewal options given to the tenants in some instances; making in all three hundred houses, and constituting the village of Sewanee. These lands, and the entire property of the corporation, were given to it by liberal-minded donors originally or from time to time. The assessments complained of were made and sought to be made upon the one thousand acres of real estate and improvements so rented or leased, excluding therefrom the university buildings proper and a church, but including the houses of professors."

(Supra, pp. 157–158, 9 S.W. p. 893)

The Supreme Court reversed the trial Court in the Skidmore case, stating in its opinion that these leased premises were exempt from taxation by the County "so long as such land belongs to said university." However, it is important to point out that in the Skidmore case the County was not attempting to assess the leasehold estates in said land, as distinguished from the fee simple estate, but was attempting to make the assessment against the land as it was owned by the University.

However, the question of whether or not the leasehold estates were subject to taxation, separate and apart from the fee simple estate, arose in the later case of Jetton v. University of South (1908), 208 U.S. 489, 28 S.Ct. 375, 52 L.Ed. 584.

The origin of the Jetton case is stated by the United States Supreme Court in the following language of the opinion:

"This is a suit in equity brought in the United States circuit court for the middle district of Tennessee, by the University of the South, a corporation, and by the several individual complainants named in the bill, who are residents of the county of Franklin, in that state, and lessees of certain lands from the university, to obtain an injunction against the individual defendants, who are a state revenue agent and a trustee of Franklin county, and also against the county of Franklin, in the above-named state, to restrain them from taking any proceedings to collect taxes from the lessees of

the university within the limits of 1,000 acres mentioned in the complainants' bill."

(Supra, p. 490, 28 S.Ct. p. 375)

In the Jetton case the Court clearly defined the distinction between a fee simple estate and a leasehold estate existing in the same property in the following· language:

"Counsel for appellee, placing the Skidmore Case aside for the moment, assert that, when this exemption was granted, leasehold interests were only assessable against the owner of the fee as part of the whole estate; and it was therefore a part of the estate exempted from taxation by the charter. We think this is not a correct construction of the contract of exemption.

As long as different interests may exist in the same land, we think it plain that an exemption granted to the owner of the land in fee does not extend to an exemption from taxation of an interest in the same land, granted by the owner of the fee to another person as a lessee for a term of years. The two interests are totally distinct, and the exemption of one from taxation plainly does not thereby exempt the other. The fact that, at the time when the exemption was granted to the owner of the fee, the state had not provided for taxation against the lessee in his own name, is not important. The different interests of an owner of the fee and an owner of an estate for years, as lessee, existed, and such existence was recognized. An exemption of one did not necessarily include the exemption of the other. The contract of exemption did not imply in the most remote degree that the state would not thereafter, through its legislature, so change its mode of assessment as to reach the interest of a lessee directly, and not through the owner of the fee. In so doing the state does not tax the owner of the land in fee nor the fee itself. It taxes what it had a right to tax,—a separate and distinct interest in the land, al-though the fee thereof be in the university, which cannot be taxed therefor."

\* \* \* \* \* \*

What is the exact interest of the lessee in the land leased to him it is not necessary to here determine. It is plain that he has some interest in it, and that interest is distinct from the fee, and may be taxed when the fee is exempt from taxation."

(Jetton, supra, pp. 500–503, 28 S.Ct. p. 377)

In order to nullify the effect of the United States Supreme Court's ruling in the Jetton case, the General Assembly of Tennessee, in 1909, enacted what is now Sub-section 8 of T.C.A. § 67–502, which is as follows:

"The property herein enumerated shall be exempt from taxation: \* \* \* (8) Leasehold estates and improvements thereon, in the hands of the lessee, holding under incorporated institutions of learning in this state, when the rents therefor are used by said institutions purely for educational purposes, where the fee in the same is exempt from taxation to said institutions of learning by charter granted by the state of Tennessee."

The boundaries of the original reserve of one thousand acres remained unchanged until October, 1968, at which time it became apparent that the County intended to again assess the leasehold estates of persons who had leased property from the University and also attempt to assess certain property of the University which had theretofore not been assessed.

At that time, October, 1968, the Board of Regents of the University redefined the boundaries of the reserve of one thousand acres in such a manner as to exclude certain property which had theretofore been included in the boundaries of the original reserve and to include other property which had not theretofore been included in said original reserve.

A map has been filed in evidence in which the boundaries of the original reserve have been outlined thereon by a green line and the boundaries of the redefined reserve have been outlined thereon by a red line.

As we have heretofore said, the County is attempting to assess the leasehold estates for taxes against the owners of such leaseholds, but in addition to these leaseholds the County is also attempting to assess certain property located within the reserve known as the Sewanee Inn and Restaurant and this assessment is being made against the University itself upon the theory that this particular portion of the University's property is being used as a private enterprise in competition with other private enterprises engaged in the motel and restaurant business.

There is little or no dispute about the facts of the case and the evidence shows that the complex of land and buildings known as Sewanee Inn and Restaurant is located within the boundaries of both the original reserve and the redefined reserve; that this property is not leased by the University to anyone but is being operated by Saga, Inc., a management corporation for and on behalf of the University by a management contract, with no profit being derived therefrom, but on the other hand, the proof shows that this complex is being operated at a loss at the present time.

The County has filed four assignments of error and the State Board has filed five assignments. However, some of the assignments filed by the State Board raise substantially the same questions raised in those filed by the County.

We will first take up and consider assignments filed by the County, but instead of considering them in the precise order in which they are filed, we will consider the second assignment first.

■ This second assignment is to the effect that the trial Court erred in holding that the Restaurant and Motel complex known as the Sewanee Inn and Restaurant is exempt from taxation.

Uncontroverted evidence in the record shows that the restaurant and motel complex known as Sewanee Inn and Restaurant is located within the boundaries of both the original reserve and the redefined reserve and it was held by the Supreme Court in the Skidmore case that property of the University which is situated within the reserve of one thousand acres is exempt from taxation so long as it belongs to the University by virtue of Section 10, Chapter 29 of the Acts 1857–58, supra.

The Constitution of 1834, which was in effect at the time the Univeristy's Charter was granted by the aforesaid Act of the Legislature, did not contain the same limitations with reference to tax exemptions as those contained in the Charter of 1870 and it was held in State v. Butler (1888), 86 Tenn. (2 Pickle) 614, 8 S.W. 586, that an exemption from taxation granted to a corporation prior to the Constitution of 1870 and then accepted and acted upon by the corporators is a contract binding upon the State, which cannot be impaired by subsequent legislative acts or constitutional provisions. In that case, the Supreme Court further said this question is too well settled to now be open to debate.

Therefore, the second assignment is respectfully overruled.

The first assignment is to the effect that the trial Court erred in holding that the University, by and through its officials, had a right to change the boundaries of the one thousand acres which it had selected in 1861 and designated at that time as an area to be exempt from taxation.

In considering this assignment, the fact that the boundaries of this one thousand acre tract were not changed from 1861 until 1968 is important. It is obvious that the one thousand acres claimed by the University as tax exempt in 1888 when the Supreme Court considered the Skidmore case is the same one thousand acres which was designated by metes and bounds in 1861.

It is also obvious that it was this same one thousand acres that was claimed by the University as exempt from taxation, when in 1908, the United States Supreme Court considered the Jetton case, since uncontroverted evidence shows that said boundaries were not changed until 1968.

Moreover, it is obvious that, when these boundaries were changed by the Board of Regents of · the University in 1968, such change was made for the purpose of including within the reserve certain property which would be tax exempt pursuant to Section 10, Chapter 29 of the Acts of 1857–58, but would not be exempt under the general law.

■ We are of the opinion that the University, having urged the courts and the county to accept the boundaries as designated in 1861 as those encompassing the tax exempt reserve in the Skidmore and Jetton cases, cannot now change these boundaries to the prejudice of Franklin County more than one hundred years after the same have been established.

We find no merit in the University's contention that the language in Section 9 of the charter, " . . . which site shall continue until changed by the Trustees. . . . ", authorizes the University to change boundaries of the reserve from time to time.

This language refers to changing of location of the University in the event the Trustees desire to locate it at some other "point" in the State of Tennessee and has no reference to changing boundaries of the reserve so long as the University is located in Franklin County.

Therefore, the first assignment is sustained.

The third assignment is to the effect that the trial Court erred in holding Subsection 8 of T.C.A. § 67–502 is constitutional and the fourth assignment to the effect that the trial Court erred in holding that the improvements belonging to lessees located upon land owned by the University are exempt from taxation by the County.

A determination of the question raised by the third assignment is interrelated with a determination of the question raised by the fourth assignment, therefore, we will consider these two assignments together.

In the Jetton case the United States Supreme Court very clearly stated that a fee simple estate and a leasehold estate in the same property are separate and distinct estates for the purpose of taxation and this distinction has also been recognized by the Legislature in T.C.A. § 67–1805 and in Sub-section 5 of T.C.A. § 67–606.

These two Code Sections are as follows:

"67–606. *Persons to whom assessed— Place of Assessment.*—. . . (5) All mineral and timber interests and all other interests of whatsoever character, whether for life or a term of years, in real estate, including the interest which the lessee may have in and to the improvements erected upon land where the fee, reversion, or remainder therein is exempt to the owner, and which said interest or interests is or are owned separate from the general freehold, shall be assessed to the owner thereof, separately from the other interests in such real estate, which other interest shall be assessed to the owner thereof, all of which shall be assessed as real estate. Provided, however, that the interest of the lessee in real estate, including the interest which the lessee may have in and to the improvements erected thereon, shall not be assessed, but shall be exempt from taxation, where the fee, reversion, or remainder therein is exempt to an educational institution as owner and said real estate and the improvements thereon are used exclusively for the purpose of housing students of such educational institution."

"67–1805. *Fee exempt from tax on leasehold.*—Where there is assessable under the law a leasehold interest in real

estate or any improvements on real estate, which said real estate is exempt from taxation in the hands of and to the owner thereof, the taxes assessed against such leasehold interest or interest in improvements on such leasehold interest or interest in improvements on such exempt real estate shall be a lien only upon such leasehold interest or interest in improvements, and not upon the interest of the owner of the fee or the remainder or reversion of the fee."

The University relies very heavily upon Sub-section 8 of T.C.A. § 67–502, heretofore quoted, and also relies upon several cases, including State v. Fisk University (1889), 87 Tenn. (3 Pickle) 233, 10 S.W. 284; Mid-State Baptist Hospital, Inc. v. City of Nashville (1963), 211 Tenn. 599, 366 S.W.2d 769, and George Peabody College for Teachers v. State Board of Equalization (1966), 219 Tenn. 123, 407 S.W.2d 443.

In State v. Fisk University, supra, the land of Fisk University which was sought to be taxed but which was held by the Court to be exempt was owned by the University, being held for future expansion and being used by the University for the time being as follows:

" 'A part of this lot is leveled off, and some trees have been planted thereon. A portion of it is each year cultivated, and was for 1884, and a crop of corn and vegetables raised thereon. Hay is also grown yearly on this lot, and mowed and fed to the cows; stables and barns are located on one corner of this lot, and were in 1884; also one small frame building used for school rooms for the students in the primary department; also another frame building for the intermediate department, built in 1887. Pupils of the college are engaged in attending to the raising, etc., of the corn, hay, and vegetables. Those so engaged receive pay for their work in board and tuition.

The corn and hay raised is fed to the cows and horses belonging to and connected with the college. The vegetables are used in the college mess-room, which mess room is situated in "Jubilee Hall," and is used for college purposes merely.' "

(Supra, 87 Tenn. p. 236, 10 S.W. p. 285)

In Mid-State Baptist Hospital v. Nashville, supra, the question presented to the Supreme Court was posed by that Court in the following language:

"Where property is and has been tax exempt for many years, and the tax exempt institution owning same, commences, construction of a structure on said property, to be used as a ward of a hospital and for occupancy by members of the hospital staff, with a portion of the completed building to be used commercially, does the property continue to be tax exempt until the building is completed and put into actual use?"

(Supra, 211 Tenn. pp. 600–601, 366 S.W. 2d p. 770)

In that case the City did not insist that the property in question was subject to taxation for years prior to 1959 but did insist that, since construction of a commercial building had been commenced thereon prior to January 10, 1959, the tax assessment date, then it was subject to taxation for that year and subsequent years.

The building was not completed and put into use until after January 1, 1960, and since that time and for the year 1960, the hospital paid taxes on this assessment.

The thrust of the Supreme Court's ruling in that case was that since the building was not put into commercial use until after 1959, the property was not subject to tax for that year.

In the Peabody College case, the property involved consisted of certain apartments and other dwelling units owned by the college and used as living quarters for mar-

ried students and their families. In its opinion the Court said:

"The facts are found in the testimony before the State Board of Equalization, and are generally undisputed. George Peabody College for Teachers is a non-profit educational institution of higher learning. It has a considerable graduate program involving older students, many of whom are married. Many of the students are already professional teachers and leaders in education; a large number of them are students from foreign countries. In many cases the off-campus community cannot, or will not, provide housing at prices these students can afford to pay. The foreign students often have a difficult time acquiring housing. Peabody College, then, has desired to provide these students housing on its own property located on or adjacent to the main campus."

(Supra, 219 Tenn. p. 125, 407 S.W.2d p. 443)

In determining that the property was exempt from taxation, the Court went on to say:

"This Court concludes that while the cafeteria, snack bar, and parking lots involved in City of Nashville v. State Board of Equalization [210 Tenn. 587, 360 S.W.2d 458] supra, were merely coincidental to the primary purpose of that institution (religion), the housing facilities here involved are directly incidental to, and as said before, an integral part of, the process of college and university education."

(Supra, p. 130, 407 S.W.2d p. 446)

■ It can readily be seen that these three cases are distinguishable from the instant case and we are not inclined to further extend the ruling in the Peabody College and Fisk University cases so as to hold that a leasehold estate which is taxable separately and apart from the fee simple estate qualifies for tax exempt status under Article 2, Section 28 of the Constitu-

tion of 1870 solely by reason of the fact that rental paid to the owner of the fee simple estate is used for educational purposes.

As we have heretofore said the United States Supreme Court has clearly recognized the principle that the fee simple and leasehold are separate estates which may exist in the same parcel of real estate for the purposes of taxation.

The leasehold interests which have been assessed by the County in the instant case are not being used, in any sense of the word, for a purpose which is purely religious, charitable, scientific, literary or educational.

In State ex rel. v. Waggoner (1931), 162 Tenn. 172, 35 S.W.2d 389, the Supreme Court said: " . . . it is incumbent on one claiming for his property an exemption from taxation to show that such property comes within the exempting clauses of the *Constitution* and statute," citing M. E. Church, South v. Hinton (1893), 92 Tenn. 188, 21 S.W. 321. (emphasis supplied)

■ Such leasehold estates do not qualify for tax exemption by the Legislature under Article 2, Section 28 of the Constitution of 1870, and, therefore, to hold that Sub-section 8 of T.C.A. § 67–502 could be applied so as to grant tax exempt status for leasehold estates which do not meet the requirements of use as expressed in Article 2, Section 28, would place the stamp of approval upon an unconstitutional exercise of legislative authority.

The pertinent part of Article 2, Section 28, is as follows:

"All property real, personal or mixed shall be taxed, but the Legislature may except such as may be held by the State, by Counties, Cities or Towns, and used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational . . . . "

Therefore, we are of the opinion that, to the extent Sub-section 8, T.C.A. § 67–502 *, purports to grant tax exempt status to a leasehold estate which is not being used for a purpose which is purely religious, charitable, scientific, literary or educational, this Sub-section 8 is unconstitutional and void.

It is correct, as insisted by the lessees, that the terms and provisions of their leases place stringent limitations upon their rights and interests in the leased premises. However, this is a matter which affects the values of the various leasehold estates and has no bearing upon the question of tax exemption. It must be concluded that each leasehold estate has some value, be it much or little.

The third and fourth assignments are sustained.

We will now consider the five assignments filed by the State Board, and as we have already said, some of these assignments raise substantially the same questions raised by the County's assignments.

The first assignment is to the effect that the trial Court erred by holding that the leasehold estates were exempt from taxation because the rental received by the University was used for purely educational purposes.

The second assignment is to the effect that the trial Court erred by finding that the leasehold estates, originally located on non-exempt land, were entitled to the benefit of the exemption granted to the University pursuant to Chapter 29, Acts of 1857–58.

The fourth assignment is to the effect that the trial Court erred by finding that the County's assessment of the leasehold estates was null and void and should be stricken from the assessment records.

The fifth assignment is to the effect that the trial Court erred by permanently en-

joining the County from assessing the property of the lessees for the purpose of taxation.

It will be seen that the foregoing assignments numbered one, two, four and five filed by the State Board raise substantially the same questions raised in assignments numbered one, three and four filed by the County.

Therefore, assignments one, two, four and five filed by the State Board are sustained for the reasons set forth in this opinion.

The third assignment filed by the State Board is to the effect that the trial Court erred by directing the County to refund to each taxpayer all monies paid as taxes because of the assessments here involved.

For the reasons heretofore set forth in this opinion, so much of the State Board's third assignment which challenges the trial Court's action in directing the County to refund taxes paid under protest by the lessees is sustained, but that portion of the assignment which challenges the trial Court's action in directing the County to refund taxes paid under protest by the University is overruled.

In order to conform the trial Court's decree to the conclusions reached in this opinion, a decree will be entered in this Court as follows:

Paragraph numbered three of the trial Court's decree will be reversed and set aside and substituted therefor will be the following language:

Section 10 of the University of the South's Charter (Chapter No. 29, Acts 1857–58), which is heretofore set forth in this opinion, is a legal and valid exemption from taxation by Franklin County of a body of one thousand acres of land and improvements thereon owned by the University and heretofore specifically de-

---

* (T.C.A. § 67–502 has been repealed and a new Code Section substituted therefor by Chapter 226, Public Acts of 1973, which was approved by the Governor on May 14, 1973.)

scribed in this opinion as the original reserve.

Paragraph numbered "four" of said decree is reversed and set aside in its entirety.

Paragraph numbered "five" of said decree is reversed and set aside in its entirety.

Paragraph numbered "eight" of said decree is reversed and set aside in its entirety.

By the decree to be entered in this Court it shall be further ordered, adjudged and decreed (1) that the property of the University known as Sewanee Inn and Restaurant is exempt from taxation and the County is enjoined from assessing it for taxation so long as it is owned by the University, that if the University has paid to the County under protest any tax upon said Sewanee Inn and Restaurant property it shall be refunded.

(2) That the leasehold estates of all persons or corporations in property of the University, both within and outside the original reserve, are not exempt from taxation except in cases where a leasehold estate is being used by the lessees or their assignees for purposes which qualify them for tax exempt status. It does not appear from the evidence that any of said leasehold estates which have been assessed for taxation by the County are being used for any such purpose at the present time.

In all other respects, the decree of the trial Court is affirmed and the case will be remanded to that Court for enforcement of said decrees and for such further proceedings, consistent with this opinion, as may be necessary and proper.

The costs of this appeal will be paid by Franklin County.

SHRIVER and TODD, JJ., concur.

OPINION ON PETITION TO REHEAR

PURYEAR, Judge.

Counsel for complainants have filed a very earnest and respectful petition to rehear in which they insist that complainants are much aggrieved by that portion of our opinion·in which we held, that to the extent Sub-section 8 of T.C.A. § 67–502 purports to grant tax exempt status to a leasehold estate which is not being used for a purpose that is purely religious, charitable, scientific, literary or educational, this subsection 8 is unconstitutional and void.

In support of this petition, counsel have filed an able brief in which they rely upon certain cases which they say were, through inadvertence, not fully discussed in their original brief and argument.

Of course, the fundamental distinction between the case at bar and these cited cases is the fact that in the case at bar only the leasehold and not the basic fee in the property under consideration is sought to be assessed by the County, whereas, in these cited cases, an assessment was attempted to be made without consideration for distinction between the two estates (leasehold and basic fee).

In our original opinion we emphasized the fact that we are here dealing with property in which there exists two separate and distinct estates, one a fee simple and the other a leasehold, citing T.C.A. Sections 67–606 and 67–1805 and the case of Jetton v. University of South (1908), 208 U.S. 489, 28 S.Ct. 375, 52 L.Ed. 584.

It is the leasehold estates which do not come within the ambit of constitutional legislative authority to grant tax exempt status under Section 28, Article 2, of the Constitution and the effect of our original opinion is not intended to extend beyond the peculiar facts and circumstances which were and are before this Court in the case at bar.

Moreover, the tax exemption effect of Vanderbilt University v. Cheney (1905), 116 Tenn. 259, 94 S.W. 90, and M. E. Church South v. Hinton (1893), 92 Tenn. 188, 21 S.W. 321, has been considerably diminished or narrowed by the opinion of the Supreme Court in Nashville v. State Board of Equalization et al. (1961), 210 Tenn. 587, 360 S.W.2d 458, wherein that Court said:

"The scope of exemption, as applied. in the Cheney and Hinton cases, was somewhat narrowed in Ward Seminary v. City Council (1913), 129 Tenn. 412, 167 S.W. 113, which involved the 1907 Act. There, an educational institution, a corporation organized for profit, not general welfare, owned several pieces of real estate, some used in carrying on the school and some not so used but rented to others for business purposes. It was held that the property used for the purpose of the school was exempt, but that which had been rented for business purposes was not exempt.

There, Chief Justice Green said that the Fisk, Hinton, and Cheney cases had held that certain income-bearing property, [although] 'not actually used for religious, charitable or educational purposes,' was exempt, upon the theory that the income had been used for such purposes; but that in those cases the property was owned by corporations not for profit but for general welfare; and that the rule applied to them would not be extended to a corporation for profit. He said:

'The doctrine of Methodist Episcopal Church, South, v. Hinton, and of other cases above cited, was announced by divided courts, and has been subjected to criticism. It certainly will not be extended. * * *' (129 Tenn. 421, 167 S.W. 115). For further criticism of the Hinton case, see Zollman American Law of Charities (1924) section 724. (emphasis supplied)

The tax exemption was further narrowed in State ex rel. v. Waggoner (1931), 162 Tenn. 172, 35 S.W.2d 389. There, Ward-Belmont College owned a house, located just across the street from its campus, which it furnished 'rent-free' as a residence to its vice-president and business manager. It claimed exemption for the house on the ground that it was being used primarily for an educational purpose and only incidentally as a home of the school's employee. The Court denied this claim."

\*     \*     \*     \*     \*     \*

"Thus, it is seen that the scope of tax exemption of property of such institution has been steadily narrowed by decisions of this Court under our successive revenue acts, including the Act of 1907 (1932 Code sec. 1085(2); and that Act was expressly repealed, and the exemption further restricted, by the Act of 1935 (ch. 47, now T.C.A. § 67–502(2)."

\*     \*     \*     \*     \*     \*

" . . . . it is quite clear that this Act excepts and exempts real estate of such an institution from the common burden of taxation only if and when such real estate

(1) is 'occupied by such institution or its officers exclusively for carrying out thereupon one (1) or more of the purposes' of its charter, and

(2) is being 'used exclusively' for such purpose, and any part of such real estate 'not so used exclusively' for such purpose, 'but leased or otherwise used for other purposes,' shall be taxed to the extent of its value."

(Supra, pp. 599, 600, 601, 605, 360 S.W. 2d p. 464)

In LaManna v. University of Tennessee (1971), 225 Tenn. 25, 462 S.W.2d 877, the Supreme Court merely upheld the constitutionality of T.C.A. 67–502(2) insofar as it provided that: "all property of any educational institution owned, operated, or con-

trolled by the state of Tennessee as trustee, or otherwise shall be exempt from taxation." 225 Tenn. p. 28, 462 S.W.2d p. 879.

In that case the Supreme Court recognized two standards of exemption, first, for educational properties owned by private institutions and, second, for educational properties owned, operated or controlled by the State of Tennessee, citing State ex rel. Beeler v. Nashville (1942), 178 Tenn. 344, 157 S.W.2d 839.

This Court is not inclined to further extend the "use of proceeds" test by applying it to a leasehold interest which is acquired by lease contract from a private educational institution which leasehold interest is being used for a nonexempt purpose, especially in view of the fact that the application of such test was, at least, partially rejected in Nashville v. Board of Equalization, supra.

When the General Assembly repealed T. C.A. 67–502(8) by enactment of Chapter 226 of the Acts of 1973, that body likewise partially rejected such "use of proceeds" test by expressly forbidding its application in the year 1973 and subsequent years insofar as rent from a private educational institution's realty is concerned. Supra, Sec. 5, Subsec. 2.

For the foregoing reasons, the petition to rehear is respectfully denied.

SHRIVER and TODD, JJ., concur.

TODD, Judge (concurring).

The record presents an issue of procedure and jurisdiction which is not assigned as error or argued in this Court. However, such issue should not escape comment.

The recognized procedure for obtaining relief from improper assessment of property has been by successive appeals to the County Board of Equalization and the State Board of Equalization, and, thereafter, by petition for certiorari to the courts. Indeed, from the holding of Elliott v.

Equalization Board of Carter County, 213 Tenn. 33, 372 S.W.2d 181 (1963), and Tennessee Enamel Mfg. Co. v. Hake, 183 Tenn. 615, 194 S.W.2d 468 (1946), it would appear that the above course of procedure is exclusive.

The procedure adopted in the present case completely omitted statutory appeal to the local board of equalization and the State Board of Equalization and produced the anomalous situation of a quasi-judicial body (the State Board of Equalization) intervening as an interested party in a dispute which has never been presented to that body.

An expression from the Supreme Court regarding the acceptability of the procedure in the present case would be most helpful to the bar and courts.

With the foregoing comment, I concur in the principal opinion of this Court.